UNITED STATES of America, Plaintiff,

v.

Henry Bert MEANS, Defendant.

Crim. No. 50033–01.

United States District Court,
D. South Dakota, W.D.

Nov. 30, 1983.

Philip N. Hogen, U.S. Atty., Sioux Falls, S.D., Reed Rasmussen, Asst. U.S. Atty., Rapid City, S.D., for plaintiff.

Terence R. Quinn, Stephens, Quinn & Buckmaster, Michael Day, Stephens, Quinn & Buckmaster, Belle Fourche, S.D., for defendant.

## MEMORANDUM ORDER

BOGUE, Chief Judge.

■ This Court conducted a hearing on the government's motion to transfer the Defendant, Henry Bert Means, from juvenile to adult court pursuant to 18 U.S.C. § 5032. The Court's statutory duty in this matter is to authorize a transfer if it is in the interest of justice. 18 U.S.C. § 5032. In assessing whether a transfer would be in the interest of justice, this Court must consider evidence of the factors enumerated in Section 5032 and make findings in the record with regard to each factor. *Id.* The final decision whether or not to transfer the Defendant to adult status is within the sound discretion of this Court. *United States v. Alexander*, 695 F.2d 398, 400 (9th Cir.1982).

The evidence before this Court includes: 1) a certificate for juvenile proceeding, 2) a statement of probable cause by an agent of the Federal Bureau of Investigation (FBI), 3) an affidavit of the Assistant United States Attorney responsible for this case, 4) a written report by the psychiatrist who examined the Defendant, 5) a written report by the psychologist who also examined the Defendant, 6) a written report compiled by a United States probation officer pursuant to Court order, 7) testimony of that same probation officer, 8) testimony by an agent of the FBI, 9) testimony by the Defendant himself at the hearing on the motion, 10) testimony of a social service worker who has known the Defendant's family for fifteen years, 11) testimony of an adult probation officer on the Pine Ridge Indian Reservation, and 12) testimony of a police officer from this same reservation. After

considering all of this material, this Court concludes that the interest of justice would best be served by granting the government's motion to transfer. *Id.; United States v. J.D., R.S., and J.S.,* 525 F.Supp. 107 (S.D.N.Y.1981). *Cf. United States v. E.K.,* 471 F.Supp. 924 (D.Or.1979) (existence of one specialized juvenile facility precluded conclusion of no chance for rehabilitation; motion denied). The following constitutes the Court's findings with regard to each of the factors specified in 18 U.S.C. § 5032.

1. AGE.

▉ Henry Bert Means was born on July 18, 1966 at Pine Ridge, South Dakota. The offense charged in the juvenile information is alleged to have occurred on or about April 10, 1983, approximately three months before the Defendant's seventeenth birthday.

2. SOCIAL BACKGROUND.

The Defendant is the youngest of three boys born to the marital union of Walter J. Means and Geraldine Flying Hawk, Sioux Indians native to the Pine Ridge Indian Reservation. Henry lived with his parents until their divorce when he was eight years old. Henry remembers his parents fighting and his father physically abusing his mother. He also remembers his father and mother drinking heavily. At the time of the divorce, the family was living in Denver, Colorado. Following the divorce, Henry and his brothers returned to South Dakota to live with their grandmother on the reservation. Henry then became the victim of a custody fight and lived for brief periods of time in Denver, Colorado and numerous towns in South Dakota with each of his parents and his grandmother.

Although Henry lived with different relatives in different places, he was primarily the responsibility of his father. Henry's father has two federal felony convictions and a history of alcohol abuse. He has a reputation on the reservation of being a "bootlegger"; Henry testified to this fact at the transfer hearing. Consequently, Henry's father has provided little, if any, guidance nor has he set a positive example for Henry.

Henry's mother has remarried and started a new family which excludes Henry and his brothers. Henry testified that he last saw his mother two years ago. His last significant contact with her occurred at age twelve when she placed him in the Pierre Indian School at Pierre, South Dakota, pursuant to tribal court order. Henry stayed at this school only a few months before running away to live with his father in Pine Ridge.

Subsequently, Henry tried relocating with friends in Wyoming. He briefly entered the Job Corps. Henry simply was unable to cope with these relocations and returned to the reservation.

In sum, Henry has spent most of his life drifting around the Pine Ridge Indian Reservation. He has associated mainly with relatives who have had similar problems and who have been involved in considerable criminal activity on the reservation. Henry's social environment includes peers and family members who regularly abuse alcohol. Henry himself has intermittently abused alcohol.

This Court is not insensitive to the social plight of Henry Bert Means. Far too many similar profiles of your men and women have come before the Court over the past thirteen years. Certainly, this type of background militates against transfer.

3. THE NATURE OF THE ALLEGED OFFENSE.

Henry Bert Means is before this Court upon a juvenile information charging him with second degree murder, 18 U.S.C. §§ 1153, 1111. The Defendant is alleged to have shot the victim, Kevin Dale Bordeaux, in the back while the victim was face down on the ground. For the purposes of the instant motion only, the Court will accept the account of the incident, as it appears in the record, as follows:

The offense allegedly occurred near Henry's father's house in Pine Ridge. At least

at the beginning, the incident fairly can be described as a gang fight between families that had been quarreling with one another for years. The Defendant and the victim apparently had never before fought each other.

It appears from the record that Henry and Jim Means and Darrell Goings were to fight the victim and two of his friends. The victim was known as an experienced street fighter. Although the Defendant had been in trouble in the community, he was not known to be active in street fighting.

Apparently, both sides were trying to gain an advantage in the fight by using available weapons. The victim had a "fist load" in his gloved hand. A "fist load" is a weapon used in street fighting to strengthen a blow. At some point during the fight, it appears that the Defendant produced a .22 caliber rifle. The Defendant struck the victim with the rifle, breaking the stock of the rifle and knocking the victim to the ground. The evidence indicates that at this point, while the victim was face down on the ground, the Defendant shot him in the back and killed him.[1]

There can be no question but that the alleged offense is of a grievous and serious nature. It is clear that this factor weighs heavily in favor of transfer.

### 4. THE NATURE AND EXTENT OF THE JUVENILE'S PRIOR DELINQUENCY RECORD.

The Defendant has had numerous problems as a juvenile, progressively becoming more serious as he gets older. Most recently, on August 23, 1983 and subsequent to the filing of the information in the instant matter, Henry was arrested for breaking into a home and stealing a chainsaw. The prosecution of the case is pending. Henry denies knowing anything about this charge. On June 2, 1983, Henry was arrested for driving at a high rate of speed in Pine Ridge under the influence of

alcohol at 3:30 A.M. Henry received ninety days tribal probation.

Prior to this time, a fraud charge involving a long-distance telephone bill was withdrawn. Henry testified that it was a misunderstanding. At age sixteen, the charge of disorderly conduct was held in abeyance. Similarly, curfew violations at ages fifteen and sixteen were held in abeyance. The latter violation was accompanied by a drunk charge.

The Defendant was arrested at age fourteen for driving a car stolen at Rapid City. Henry admitted at the hearing that he was connected with a theft ring involving his brother and his cousins. At age thirteen, Henry received nine months tribal probation. The record does not reveal the details of the offense. At that same age, Henry received six months probation for driving without a permit. Finally, as previously discussed, Henry ran away from the Pierre Indian School when he was twelve years old.

No doubt, this delinquency record stems from Henry's social background. Efforts to treat this delinquency, however, apparently were unsuccessful. Although no prior violence has been indicated, the record reveals a pattern of more serious incidents as Henry becomes older.

### 5. THE JUVENILE'S PRESENT INTELLECTUAL DEVELOPMENT AND PSYCHOLOGICAL MATURITY.

The written reports of both the psychiatrist and the psychologist who examined Henry indicate that he appears to be of less than average basic intelligence. Testing reveals that Henry's IQ is in the dull normal range. Such assessment is consistent with his school records as reported by the probation officer. School officials report that Henry was passed socially through the eighth grade in 1981. Testing at that time demonstrated Henry was reading on a second grade, first month level. His grades were consistently low in the D and

---

**1.** The psychologist's report states that Henry denied remembering actually pulling the trigger.

F range. School records further disclose, however, that Henry had a serious absenteeism problem which certainly contributed to his poor performance in school. In a related context, the evidence indicates that Henry has some aptitude for mechanical work. Witnesses testified that Henry was a good auto mechanic and often worked on the tribal police cars. The psychologist's report stated that Henry has good spatial abilities which reflects his interest in mechanical operations.

Based on the written reports of the probation officer, the psychiatrist and psychologist, as well as the testimony of the witnesses, the Court finds that although the Defendant's intellectual development is limited, there is no impairment of his capacity for logical and rational thought.

The psychiatrist described Henry Bert Means as a highly dependent and anxious individual.[2] The doctor concluded that the lack of stability in Henry's environment has rendered him a rather shiftless and disillusioned person. Further, the psychiatrist candidly states that Henry "needs many years of psychotherapy both individual and group as well as potential medication management for his high level of anxiety and probable underlying depressive traits."[3]

The psychiatrist, psychologist and probation officer all agree that Henry presents a socially immature profile. Geraldine True Blood testified that although Henry was immature socially because of environment and lack of education, he was quite mature in a street sense in that he has had to fend for himself for years. The probation officer agrees that in this sense Henry is quite mature because he has taken care of himself and survived alone since he was twelve or thirteen years old.

Witnesses called on Henry's behalf described him as a quiet, shy boy and a nice, responsible kid. Although teachers described Henry as being a poor student, they said he was pleasant and polite. At Henry's interviews with the probation officer, however, Henry still seemed to feel little or no remorse for allegedly killing another human being. Furthermore, Henry somehow feels that the shooting was not his fault even though he admits pulling the trigger. The psychiatrist, on the other hand, reported that Henry did demonstrate remorse.

Based on the record before the Court, it is indeed difficult to assess Henry's psychological maturity. It is apparent and the Court so finds that in a social context, Henry is quite immature. The Court further finds, however, that in other contexts previously described, Henry is quite mature. As the probation officer noted in his report:

> [Henry] knows how to get by and has probably witnessed a great deal more than most 17 year old boys his age. Even at this tender age, he has come close to seeing it all and in this sense he is wise beyond his years even though misdirected.

### 6. THE NATURE OF PAST TREATMENT EFFORTS AND THE JUVENILE'S RESPONSE TO SUCH EFFORTS.

The record shows that Henry has never been treated for any psychological, emotional, learning or behavioral problems. Henry did enter the Job Corps in the past, but was unable to cope with the situation and returned to the reservation. Geraldine True Blood testified that she has assisted Henry in reapplying for the Job Corps. He is currently on a waiting list.

---

**2.** The psychologist summarized and concluded that "[i]t does seem very likely that Henry would not have picked up the gun or pulled the trigger without encouragement from another individual." Further, the psychiatrist noted that "[i]t is interesting that most of [Henry's] offenses including the one in question occurred in the presence of other individuals upon whom he is dependent for self-esteem and shallow nurturance."

**3.** The psychiatrist did state, however, that Henry was capable of assisting his attorney with his defense.

Henry's response to treatment is unknown at this time. The record indicates, however, that it will be difficult for Henry to adjust to living off the reservation and to accepting newly imposed guidelines and behavioral modes.

### 7. THE AVAILABILITY OF PROGRAMS DESIGNED TO TREAT THE JUVENILE'S BEHAVIORAL PROBLEMS.

The probation officer's report indicates that all programs available to Henry as a juvenile also would be available to him as an adult, if this Court so requests. Of course, the main difference is the length of sentence that may be imposed. If convicted and sentenced as a juvenile, Henry would face a maximum penalty of commitment until his twenty-first birthday. 18 U.S.C. § 5037(b). Additionally, because of Henry's age, if he was sentenced as a juvenile, he would probably be placed in one of the larger youth correction systems such as the Kentucky or California Youth Systems. At the hearing, the probation officer testified that there would be adequate programs available to treat Henry's behavioral problems.

If Henry was convicted and sentenced as an adult, he would face a maximum penalty of life imprisonment. 18 U.S.C. § 1111(b). If this were the case, the sentencing court could utilize the flexible sentencing provisions of the Federal Youth Corrections Act (FYCA). 18 U.S.C. § 5010. The probation officer testified that Henry could be sent to a juvenile type facility until age twenty-one and that there would be adequate treatment available to treat Henry's behavioral problems. The probation officer's report indicates that if sentenced to incarceration pursuant to this Act, Henry would most likely go to the Federal Correctional Institution at Englewood, California, which is primarily set up for young adults sentenced under the FYCA. At that facility, programs similar to those found at other institutions would be available to Henry but generally with a younger population. Finally, the probation officer testified at

the hearing and concluded in his report that sentencing under the FYCA probably would be most beneficial to all concerned.

If Henry is sentenced as an adult, without the benefit of FYCA, his offense severity rating may require that he be placed in a relatively high security institution with an older adult population. Even in this situation, however, the Bureau of Prisons has the option of placing him in a juvenile facility, if one can be found that will accept him and if the Court approves of such placement.

Because rehabilitation is a primary goal of the Federal Juvenile Delinquency Act, S.Rep. No. 93–1011, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News pp. 5283, 5320; *J.D., R.S., and J.S.*, 525 F.Supp. at 110, "a decision to transfer a juvenile to adult status is a prediction of the possibility of rehabilitation if in fact the juvenile is found guilty of the crime alleged." *Alexander*, 695 F.2d at 401.

> [A] balance must be struck somewhere and somehow between providing a rehabilitative environment for young offenders as well as protecting society from violent and dangerous individuals and providing sanctions for anti-social acts. And that balance must be struck in the context of a transfer hearing.

*E.K.*, 471 F.Supp. at 932. Under these standards and when all factors are considered and weighed, this Court feels compelled to strike such balance in favor of the threat to society posed by the alleged juvenile crime in this matter. This is not a case where a juvenile is accused of stealing a pie; it involves the ultimate violent act, the taking of a human life. If true, which truth the Court assumes for the purposes of this motion, the manner and circumstances of the alleged crime reveal a vicious and savage act. This type of violent act abounds on the Pine Ridge Indian Reservation and our federal criminal justice system must continue the attempt to deal effectively with it. If our laws in general and the transfer statute in particular are to

have any meaning, this case must be transferred. Accordingly, it is hereby

ORDERED that the government's motion to transfer Henry Bert Means from juvenile to adult status is granted.